IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 15, 2011 Session

## IN RE: CALEB L. C.

**Direct Appeal from the Circuit Court for Sullivan County**
**No. C13419      R. Jerry Beck, Judge**

**No. E2010-00100-COA-R3-JV - FILED MAY 4, 2011**

This is a dependency and neglect case. The child's mother is deceased, and the child's father has a long history of physically abusing family members. Both the juvenile court and the circuit court, on *de novo* appeal, found the child to be dependent and neglected and determined that the child's best interests were served by remaining in the custody of his maternal uncle and aunt. Discerning no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and JOHN W. MCCLARTY, J., joined.

Ricky A.W. Curtis, Blountville, Tennessee, for the appellant, Randall Cregg C.

Sarah Y. Sheppeard, Knoxville, Tennessee, Wendy Brooks Crew, Birmingham, Alabama, and Randall M. Kennedy, Bristol, Tennessee, for the appellees, Roger Redmond and Stephanie Redmond.

### OPINION

#### I. Background Facts & Procedure

This is a dependency and neglect case originating in the juvenile court for the City of Bristol, followed by a *de novo* appeal in the circuit court for Sullivan County. In both of these proceedings, the minor child, Caleb L. C.[1], was adjudicated dependent and neglected

---

[1]In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity. In this case, in order to preserve both clarity and the anonymity of the child, we will redact

(continued...)

and custody was awarded to the child's maternal uncle and his wife. The child's biological father appeals.

Caleb was born November 11, 2003, to Teresa C. ("Mother") and Randall Cregg C. ("Father"). Mother and Father married on February 18, 2004, and Caleb was the only child born to the marriage. A year and a half later, in August 2005, the two separated after Father allegedly assaulted Mother. Mother went to live with her stepfather, Lee Barnes, and later obtained a temporary restraining order prohibiting Father from "coming about, molesting, harassing, assaulting, threatening or harming [Mother], or the parties' minor child, Caleb [], in any manner whatsoever at any time and at any place."

Mother subsequently filed for divorce from Father in October 2005. Father did not make an appearance in the divorce proceeding, and a default judgment granting a divorce was entered against him in the circuit court for Hawkins County on February 9, 2006. The divorce decree specifically made permanent the restraining order prohibiting Father from contacting Mother or Caleb, and a parenting plan was approved which gave Father no parenting time whatsoever. Father was further ordered to pay monthly child support.

Less than a month later, on March 7, 2006, Mother died unexpectedly. Following her death, Mother's family took the child in. Members of Mother's family later testified that, at the time, they did not know the whereabouts of Father, and it does not appear that he was immediately contacted concerning Mother's death. Mother's stepfather, Mr. Barnes, filed a petition in the juvenile court for the City of Bristol alleging that Caleb was dependent and neglected. Mother's brother, Roger Redmond, and his wife, Stephanie Redmond, were later substituted as petitioners and are the Appellees herein. On March 22, 2006, the juvenile court held a hearing on the petition; Father did not appear. He later claimed, by affidavit, that he did not receive notice of the hearing until March 23, 2006. Following an *ex parte* hearing, the juvenile court awarded the Redmonds temporary custody of Caleb, and they returned with Caleb to their residence in Homewood, Alabama. On May 9, 2006, Father filed a petition in the juvenile court seeking to set aside the custody order.

The juvenile court held a hearing on Father's petition beginning in February 2008 and concluding in August 2008. The delay between Father's filing of the petition and the hearing date is not explained by the record because little of the juvenile court record is contained in the appellate record. By entry of an order on October 13, 2008, the juvenile court found the child to be dependent and neglected and directed custody to remain with the Redmonds. The

---

[1](...continued)
the names of individuals sharing the child's surname, and will refer to those individuals by their given name and the first letter of their surname.

juvenile court's order provided for visitation with Father every other weekend in Birmingham, Alabama, under the supervision of Dr. Karen Turnbow, a clinical child psychologist. The order required Father to pay Dr. Turnbow's fee, which was fixed at $780 per visit. Father was ordered to pay child support to the Redmonds in the amount of $291 per month[2] and a judgment for $9,620 was entered due to his arrearage from February 2006 to September 2008.

Father then filed a timely notice of appeal on October 22, 2008, seeking a *de novo* hearing before the circuit court for Sullivan County. On December 5, 2008, Father filed a motion to set immediate hearing dates and for the return of his child *instanter*. A hearing was set for December 15, 2008, and although the Redmonds filed a motion to continue this hearing date, it appears from the record that a hearing was in fact held on that date. An agreed order was entered December 19, 2008, whereby the circuit court provided for visitation during Christmas and directed the parties to coordinate a date for trial.

The parties filed numerous motions and responses and litigated the case in the circuit court vociferously. Of note, among several other filings, on April 28, 2009, Father filed a second motion to set immediate hearing dates and for the return of his child *instanter*. Likewise, on April 28, 2009, Father filed a motion for the appointment of a CASA special advocate to conduct an inspection of Father's home. Though it is not entirely clear from the appellate record, it appears that the trial court dealt with these and other matters in orders dated July 16, 2009, and September 28, 2009, the latter order being tendered to the court on August 3, 2009, at the beginning of the *de novo* hearing. Nevertheless, these orders indicate that the trial court directed the parties to schedule the trial at the earliest available date and also directed the Department of Children's Services to perform an inspection of Father's home.

A *de novo* hearing was held in the circuit court from August 3 through August 6, 2009. Much of the evidence adduced at this hearing centered on Father's alleged lifelong pattern of physically abusing family members. Although there was no evidence of Father having physically abused Caleb, the Redmonds sought to show that Father's history of abuse presented a substantial risk of immediate harm to Caleb if he were placed in Father's custody.

At the time of the hearing, Father had been married five times to four different women. Father's first wife, Anndora Corley, described a marriage filled with abuse. The two married young, when he was approximately nineteen years old and she fifteen, and the marriage lasted for approximately eight years before ending in divorce in 1990. Ms. Corley

_____

[2]This amount was equal to $838 per month per the Tennessee Child Support Guidelines less a credit of $547 per month, which was automatically withdrawn from Mother's Social Security death benefits.

testified to near constant beatings at the hands of Father after "he would fly off the handle over no reason at all." She said that "[h]e would hit me in the face, knock me out, hit me in the stomach." Sometimes her injuries required stitches, and she showed the court lasting scars on her eyebrow and lip. One time, Ms. Corley went to the emergency room after Father hit her in the face and "the bleeding wouldn't quit." She testified that Father told her to tell the police that she had gotten in a fight or else he would kill her. Another time, he told her that he would "cut her body up and throw it in the river."

Ms. Corley recounted Father choking her until she was unconscious and lost control of her bodily functions. She described him beating her on the back with a broom and breaking her nose twice. She alleged that one time Father threatened to burn their house down with her in it, even going so far as to pour gasoline on the steps of the house. According to Ms. Corley, "[t]he holidays were the worst" because "he didn't want me to be with my family and he would make sure I was bruised or beaten bad enough to where I couldn't go see my family."

Ms. Corley testified that she only filed criminal charges against Father once and that he talked her into withdrawing the charges. She stated that, after she withdrew the charges, Father told her "[h]e would kill me if I ever embarrassed him like that again." Father filed for divorce in approximately 1990, and Ms. Corley stated that she had only seen Father once since then.

Janice C., Father's second and third wife, also testified to an abusive marriage. The two first married in 1989 or 1990[3], divorced soon after, remarried in 1993, and divorced again in 1995. They had one daughter, Madison C. According to Janice C., although Father "caused some trauma in my life" during their first marriage, he did not start beating her until the second marriage, though she ultimately sought both divorces on grounds of cruel and inhuman treatment. On cross-examination, it was noted that other than filings related to their divorces, she never filed charges or otherwise documented Father's alleged abuse.

Janice C. testified that she called the police following Father's violent outbursts on "many" occasions. She described one time when he pushed her into the bathtub while she was pregnant with Madison. She recounted in detail an incident in which Madison was sitting in her lap, and "just out of nowhere Cregg [i.e., Father] appeared with a butcher knife from our kitchen and held it to my throat and told me that he could kill me and no one would know it." Another time, the two went to counseling and Father became upset and wrecked the counselor's office by raking everything off the desk, throwing chairs, and knocking

---

[3]Father apparently began a romantic relationship with Janice C. while still married to Ms. Corley, and both women confirm that Janice C. paid for Father's divorce of Ms. Corley.

pictures off the wall. Janice C. testified that, when they got home, Father held her against a brick wall and choked her until she thought he might kill her. She was eventually saved when her sister-in-law, Tammy C. C., and her husband pulled into the driveway and were able to pull Father away.

Janice C. testified that, when she was living with Father, she "walked on eggshells [because she] never knew what kind of mood he was going to come home in." Describing his temper and mood swings, she said, "I always tried to look outside the window when he came home from work to see if I could tell what kind of mood he was in because you never knew, you know, if you was supposed to talk to him when he walked through the door or if you needed to run and hide." She testified that, when Madison was a baby, she would never leave her alone with Father because she "was afraid [Madison] would cry and [of] what he might do to her in a rage."

As part of their divorce, a restraining order was entered against Father with respect to both Janice C. and Madison. Janice C. testified that Father did not pay his court-ordered child support for three years and that she collected a nearly $7,000 judgment against him, which the State garnished from his tax refund. She testified that, other than these garnishments, Father never made any child support payments for Madison. Although it appears that Father does currently have some contact with Madison, who was fifteen years old at the time of the hearing, that contact is very limited. Janice C. testified that, within the last year and a half, she had overheard Father telling Madison that "he could kill her [i.e., Madison] and nobody would ever know it."

Father's next wife was the deceased Mother, Teresa C. Mr. Barnes, Mother's stepfather, testified that, on the day Caleb was born, he visited Mother at the hospital and discovered that Father was not there. Hospital records that were admitted into evidence indicated that Father had become belligerent with hospital staff. Mr. Barnes said that he later spoke with Father, who told him that "he was afraid to go back to the hospital because he had a bad temper and was afraid of what he might do." According to Mr. Barnes, Father then told him that, when Mother and Caleb were ready to leave the hospital, that Mr. Barnes should take them to his own home because Father "didn't want anything to do with them anymore." It appears from the record, however, that Mr. Barnes did not do so and Mother and Caleb returned to live with Father.

Mr. Barnes also recounted the day that Mother showed up at his house in August 2005 with Caleb in tow and bruises on her neck. Mr. Barnes said that he took Mother to the police station to photograph the bruises. Charges were not filed; however, Mother did obtain a restraining order against Father in October 2005 as part of their divorce. It was after this incident that Mother and Caleb moved in with Mr. Barnes. He testified that, during this time,

he overheard Mother crying while talking on the phone with Father, and that, when he picked up an extension, he heard Father say, "[y]ou can't stop me. I can come up there and kill you, Caleb, and Lee [Barnes] and [there is] nothing you can do about it."

Members of Father's family also testified to Father's history of physically abusing those close to him. Tammy C. C., Father's sister, told the trial court that she feared for her safety in taking the stand against her brother. Tammy C. C. indicated that her fear of testifying was well-founded based on Father's history of violence. According to her testimony, Father threatened her and their brother, Michael C., "that if we interfered in any way of keeping him from his son that he would whip all of us."

She emotionally described an altercation, in approximately 1990, in which Father physically assaulted their mother, stepfather, and aunt. According to Father's sister, as a result of this altercation, their stepfather went to the hospital with injured ribs and their mother was hurt so bad that she couldn't dress herself for two weeks and needed assistance using the restroom. A restraining order was entered against Father for his mother, stepfather, and aunt, and Father plead guilty to assault stemming from the incident and was placed on probation.

Tammy C. C. also testified about the time when she and her husband were called to the home of Father by his then wife, Janice C., and discovered Father choking his wife against a brick wall. She indicated that her husband was able to separate and diffuse the situation. She described Father as being demeaning to Mother, including calling her names and telling Mother that he wished he had never had children. Father's sister also testified that she saw bruises on Mother's arms, though she did not know their origin.

When asked what concerns she had regarding Father and Caleb, Tammy C. C. said:

> I don't believe Cregg has the patience to deal with a five year old. I have seen his violent behavior throughout my whole life, for 33 years of my 44 years, and I have seen him react and interact with his children. I have never ever seen him hug or kiss his daughter Madison [C.] I have never ever seen him portray any paternal feelings toward his daughter, and yet he has a five year old that he's seeking custody of and he's not even trying to be a father to her. I don't feel like he has the patience, the love, what it takes to be a father. . . .
>
> *       *       *
>
> And I believe in order to be a parent you have to be involved in

your children's lives from the day they are born. I have never seen that out of my brother. I do not believe that he has the resources to take care of his child in the way that he is being taken care of presently, whether it is mentally, emotionally, whatever, he does not have that capacity. He has never shown that capacity to me.

In response to the next question from counsel, Tammy C. C. affirmed that she feared for Caleb's safety if the court entrusted him to Father.

Father's brother, Michael C., also testified. He relayed that the two brothers had been close through the years, but that the instant litigation had strained their relationship. Michael C. testified at length about Father's boyhood temper and aggression including violent acts against family members. He said that Father had always had a bad temper and recalled specific instances from their youth in which Father's temper led to violence.

Michael C. recounted breaking up fights between Father and their mother and stepfather, and intervening in arguments between Father and his first wife, Ms. Corley. He remembered seeing bruises on Janice C. and Mother, but did not know where they came from. When discussing Mother, he stated that "every time we talked I would tell her – I said Teresa, he's going to kill you if you don't leave him. I said [he] is going to do it and not meaning to. I said you don't understand, I said when he loses his cool, he's going to kill you and you won't know it and he won't mean to." Michael C. also recounted a conversation with Father's current wife, then fiancé, Mona C., in which he warned her of Father's past mistreatment of wives.

From the record, Michael C.'s testimony appears emotional, and he was clearly conflicted about testifying against his brother. When questioned as to his reasons for doing so, Michael C. responded:

A: Well over the years I've seen how he's acted and when this all come up, I was dreading it . . . and when I seen how he done Teresa and all when I was around Caleb, I mean, kids going to cry and stuff, you overlook stuff like that. But he's such short fused and I know Cregg would hurt him and not mean to, if he would lose his cool, he would hurt him because I have seen him lose his cool so fast over just little old stuff.

\*                          \*                          \*

-7-

Like I said, when Cregg is normal, he's fine but if its something, little short thing, he loses it too easy. I mean, he just can't handle pressure a lot and there's no way he could handle it and that's why I hate to come here but I had to for that boy because when I seen what all happened to Teresa when I was just around her, I didn't see him hit her and stuff but I seen him be short with her, I knew then I had to come here because the boy has got to be took care of.

Q: Are you afraid of what might happen to Caleb if he is entrusted to your brother?

A: Yes, I hate to say it but I am. I know maybe he does love his son. I don't know. I got two boys I got custody of. And I know what it takes to raise two boys. I mean, you know, they are boys, they are going to get into stuff and you have to have patience and Cregg just don't have the patience. He never has had the patience and there's no way you can do that to the kid.

Madison C., Father's then fifteen year old daughter from his previous marriage to Janice C., also testified. Madison, who has a two year old daughter, lived with her daughter at Janice C.'s home at the time of the hearing. She testified that Father knew where she lived and her phone number, but had little contact with her. She claimed that Father would sometimes not contact her for a year at a time, but that, in the weeks immediately preceding both the juvenile and circuit court hearings he began calling her, trying to spend time with her, and buying her gifts. She stated that he did not usually buy her Christmas or birthday gifts, and she could recount only one birthday gift from Father, a horse. Although Father told Madison that the horse died, she later discovered that he had, in fact, sold it.

Madison described an incident that occurred before the juvenile court hearing in which Father paid for her to get her hair dyed. Afterwards, Madison, Father, and his current wife, Mona C., went to a restaurant. While there, Madison testified that Father cursed at her, told her he hated her hair, said that she looked like a "whore," and threatened to kill her. Father and Mona C. were also questioned about this incident, and suffice to say, all three people had different recollections.

When asked if, in the last ten years, her Father had hit her "on few or many occasions," Madison responded "many." The only occasion that she described in detail occurred when she was in the fifth grade, and she stated that Father "smack[ed]" her on her back, legs, and buttocks with a belt. She also confirmed the testimony of another witness

that, on one occasion, Father locked her in a truck and told her "I could kill you and nobody would ever know."

Father testified on his own behalf. Father was previously employed as a truck driver, but is currently disabled and draws social security benefits in the amount of $1,097 per month. Father consistently maintained that he was not an abusive person and generally denied the allegations made against him. However, Father was found to be an extremely unreliable witness. The trial transcript is replete with instances in which Father was impeached by his former testimony from either depositions or the juvenile court hearing. As discussed in more detail below, the trial court specifically found him to lack credibility as a witness, and severely discounted his testimony except in matters corroborated by other witnesses.

Mona C., Father's wife since 2006, testified that the two shared a stable, financially secure home. At the time of the hearing, she was employed as an accountant and had a thirty year old daughter from a previous marriage. Mona C. expressed a willingness to participate in the raising of Caleb and believed that Father would be a good father to Caleb. She declared that Father had never physically, mentally, or emotionally abused her in any way. She stated that, since they met, the two had not been apart for longer than a week, and that, during that time, she had never observed Father physically assaulting anyone else. When asked whether she was aware of the allegations of abuse made against Father, she stated that she was aware of the allegations but disregarded them in forming her opinion of Father's parenting capabilities because they were not based on her interactions with him.

When questioned, Mona C. acknowledged that Father had lived in ten different places in the last five years. However, she said that the two had lived in her three-bedroom, ranch style house in Mount Carmel, Tennessee, since their marriage in December 2006. The circuit court had previously ordered a home study to be performed by the Department of Children's Services, and that report indicated that Mona C.'s home was a clean, orderly, and appropriate environment in which to raise a child.[4]

The parties stipulated that the Redmonds' home in Alabama was also a fit and proper home in which to raise a child. The Redmonds described having a generally amicable relationship with Father, although given the nature of the instant litigation, the relationship had sometimes been strained. Although the Redmonds testified to having an open invitation for Father to visit with Caleb, it appears that such visitation has been limited. Father occasionally called Caleb at the Redmonds' home, and it appeared from the record that there

---

[4]This home study was directed only to the physical attributes of the home, and did not involve a study of the fitness of Father or Mona C. to parent Caleb.

had been three supervised visitations since the juvenile court hearing. The Redmonds testified that Father had sent Caleb a shirt and some candy, but that he had not otherwise contributed financially to Caleb's support.

With regards to Father's propensity for abuse, Mrs. Redmond testified that, during these visitations, she had not witnessed any indications that Father would place his son in harm's way, although she did recount an instance of Father screaming at Caleb. She also testified that, during a deposition, Father "got angry and came across the table" toward Mr. Randy Kennedy, the Redmonds' attorney. Mr. Redmond recalled a conversation he had with Father in 2006, in which Father threatened that "if anybody gets in the way of me ever seeing my child Caleb I will see to it that no one ever sees Caleb again."

The trial court also heard from Dr. Turnbow, the clinical child psychologist appointed by the juvenile court to supervise visitations between Father and the child. She discussed the adjustment period and anxious feelings that Caleb experienced following the death of his mother and relocation to Alabama. She generally spoke positively about the interactions she witnessed both between Caleb and Father, and Caleb and the Redmonds. She remarked that Caleb called Father "dada" and was interested in interacting with him. She also noted that Caleb referred to the Redmonds as "mom" and "daddy" and said that this was normal behavior under the circumstances. She noted that there was not yet a bond or natural attachment between Caleb and Father because of Father's prolonged unavailability during critical developmental years in the child's life. Dr. Turnbow was of the opinion that it would be detrimental to Caleb's development to remove him from the Redmonds' home.

The Redmonds also called Dr. Charlton Stanley, a forensic psychologist, as an adverse witness. Dr. Stanley had performed a risk assessment on Father and concluded that Father did not pose a risk of harm to Caleb. This risk assessment consisted of administering certain clinical tests and observing a visitation between Father and Caleb. The clinical tests performed by Dr. Stanley indicated that Father did not have problems with aggression and was not a "control freak." The Redmonds pointed out that these tests measured responses voluntarily given by Father, and as was elicited during cross-examination, Father had omitted or falsified portions of the questionnaire.

Notwithstanding, certain test results indicated that Father scored poorly in relation to situational stress:

> He [i.e., Father] appears to have had mild but chronic difficulty mustering sufficient psychological resources to cope with the demands in his life. . . . [H]is below average adaptive capacities make it difficult for him to manage even ordinary stresses of everyday life without becoming unduly upset by

-10-

them. He is consequently likely to show limited tolerance for frustration and a tendency toward emotional outbursts and impulsive actions.

When questioned by the Redmonds' counsel, Dr. Stanley indicated that Father's test results were entered into a computer program, which provided the above quoted language and that it was a psychologist's role to interpret different test results and provide a comprehensive evaluation. Based on the entirety of his evaluation of Father, Dr. Stanley's conclusion was that Father did not pose a risk to Caleb.

At the conclusion of the hearing, the trial court took the matter under advisement. As apparent from this recitation of the relevant evidence adduced at the August 2009 hearing, the trial court heard evidence related not only to an adjudication of dependency and neglect, but also evidence related to the best interests of Caleb with regards to his custody. On September 9, 2009, the trial court issued notice to the parties of its intent to find the child dependent and neglected. This notice further indicated that, if the parties had completed the evidence related to a disposition of custody, the trial court was prepared to enter a final order; however, if either party desired to present additional dispositional evidence, an additional hearing would be scheduled. Father objected to this procedure, asserting that it was improper for the trial court to have heard dispositional proof at the adjudicatory hearing.

Nevertheless, an additional hearing for dispositional proof was held on November 4, 2009. The only additional proof adduced at this hearing was an expert report by Dr. Glen King, who interpreted the tests performed by Dr. Stanley. Dr. King reached a different conclusion than Dr. Stanley, and found that the results of Dr. Stanley's tests "[r]aised serious concerns about the stability of [Father] in his ability to function appropriately in roles in any family or marital situation."

After considering this additional evidence, the trial court entered its judgment on November 12, 2009, and an amended judgment on December 8, 2009. By its amended judgment, the trial court found, by clear and convincing evidence, that Caleb L. C. was dependent and neglected and awarded custody to the Redmonds. Specifically, the trial court found that Father's history of physical abuse toward other family members indicated that he would present a threat to Caleb if given custody. The court further concluded that it was in Caleb's best interests for custody to remain with the Redmonds. Father was allowed supervised visitation. He was ordered to pay monthly child support and a judgment of $3,783 was awarded to the Redmonds for his arrearage from October 2008 through November 2009. Father timely filed his notice of appeal to this Court on January 4, 2010.

## II. Issues Presented

Father raises the following issues on appeal, as restated from his brief:

(1) Whether the circuit court erred in finding the minor child to be dependent and neglected pursuant to Tenn. Code Ann. § 37-1-102(b)(12).

(2) Whether the juvenile and circuit courts deprived Father of his Constitutional rights to due process by failing to afford him a hearing in a timely manner.

(3) Whether the procedure used by the circuit court to conduct the *de novo* adjudicatory hearing deprived Father of his Constitutional right to due process.

(4) Whether clear and convincing evidence in the record supports the circuit court's findings.

## III. Applicable Law & Standard of Review

We find it useful at the outset to review the statutory scheme governing proceedings on dependency and neglect as well as the role of the juvenile court and the circuit court in such proceedings. The General Assembly has vested juvenile courts with "exclusive original jurisdiction" to hear allegations that a child is dependent and neglected. Tenn. Code Ann. § 37-1-103(a)(1). The statutes governing dependent and neglect proceedings require, in effect, a two step analysis. First, under Tenn. Code Ann. § 37-1-129, the court is to hold a hearing and make findings as to whether a child is dependent and neglected. If the juvenile court finds the child to be dependent and neglected by clear and convincing evidence, then the court is to "proceed immediately or at a postponed hearing to make a proper disposition in the case." Tenn. Code Ann. § 37-1-129(c). Making a "proper disposition" requires the court to make a custody decision "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a).

The fact that a child is dependent and neglected must be established by clear and convincing evidence. Tenn. Code Ann. § 37-1-129(c). For the evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)). The evidence should produce a firm belief or conviction as to the truth of the allegations sought to be established. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005)

-12-

(quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

In dependency and neglect cases, the General Assembly has directed that any appeal from the juvenile court is to be heard by the circuit court. Tenn. Code Ann. § 37-1-159(a). The appeal from juvenile court to circuit court in a dependency and neglect case is not the same as this Court's review of trial court decisions, as set out in the Tennessee Rules of Appellate Procedure. That is because, by statute, the circuit court is to "hear the testimony of witnesses and try the case de novo." *Id.*

While the record of the juvenile court proceeding is required to be provided to the circuit court on appeal, Tenn. Code Ann. § 37-1-159(c), the circuit court is not limited to that record. On the contrary, the circuit court in a dependency and neglect proceeding may not rely solely on the record made before the juvenile court; rather, under Tenn. Code Ann. § 37-1-159(c), the circuit court must try the case *de novo* by hearing witnesses again and by rendering an independent decision based on the evidence received in the circuit court proceeding. *Tenn. Dep't. of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 289 (Tenn. Ct. App. 2006). A *de novo* trial is "[a] new trial on the entire case – that is, on both questions of fact and issues of law-conducted as if there had been no trial in the first instance." *Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at *3 (Tenn. Ct. App. May 18, 2006). Consequently, the circuit court is not "reviewing" the juvenile court's decision; instead, it is conducting a new proceeding as though the petition was originally filed in circuit court.

To the extent the trial court made specific findings of fact in support of the ultimate issues, we review the factual findings pursuant to Tenn. R. App. P. 13(d), *de novo* with a presumption of correctness unless the evidence preponderates otherwise. *See In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009); *see also In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). If some of the trial court's factual findings are based on its determinations of the credibility of the witnesses, then this Court will afford great weight to those credibility determinations, and will not reverse such determinations absent clear evidence to the contrary. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). On the other hand, the trial court's conclusions of law concerning the ultimate issues, such as a finding of dependency and neglect, are reviewed *de novo* without a presumption of correctness. *See In re Adoption of A.M.H.*, 215 S.W.3d at 809-10.

### III. Analysis

We will first discuss Father's procedural issues, which are, in essence, two-fold: (1) whether there was impermissible delay in adjudicating this matter in both the juvenile and circuit courts; and (2) whether the procedure used by the circuit court to conduct the *de novo*

hearing was impermissible. We will then discuss whether the circuit court's findings were supported by clear and convincing evidence in the record, and whether those findings amount to a finding of dependency and neglect.

### A. Whether there was impermissible delay in the juvenile court

Father filed his first petition seeking custody of Caleb on May 9, 2006. The first hearing in the juvenile court on Father's petition was held in February 2008 and was concluded in September 2008. While we are sympathetic to Father as to the stress and difficulty such a lengthy delay may present, we ultimately find this issue to be without merit. In the first instance, Father has not directed us to any statute setting a mandatory time-frame within which a juvenile court must adjudicate a dependency and neglect case. We are likewise unaware of such a mandate. Moreover, Father, as appellant, did not include the juvenile court record in the record on appeal. *See* Tenn. R. App. P. 24(a). Consequently, there are no motions or court orders from which we could determine the reason for the delay or the steps the litigants took to pursue a rapid adjudication. Without such a record, we are left to speculate as to the reasons for the delay, or hold that such a delay is *per se* impermissible, and we decline to do either in this case.

### B. Whether there was impermissible delay in the circuit court

Father also contends that the circuit court erred when it did not conduct a *de novo* hearing within 45 days as required by Tenn. Code Ann. § 37-1-159.[5] Father's notice of appeal to the circuit court was filed on October 22, 2008. On December 5, 2008, Father filed a motion to set immediate trial dates, and set a hearing on his motion for December 15, 2008. On December 12, 2008, the Redmonds filed a motion to continue. It appears from the record that a hearing was held on December 15, 2008, and a consent order was entered on December

---

[5]Tenn. Code Ann. § 37-1-159 provides, in pertinent part:

(c) When an appeal has been perfected, the juvenile court shall cause the entire record in the case, including the juvenile court's findings and written reports from probation officers, professional court employees or professional consultants, to be taken forthwith to the criminal court or circuit court whose duty it is, either in term or in vacation, to set the case for an early hearing. When an appeal is taken from a juvenile court's decision that involves the removal of a child or children from the custody of their natural or legal parents or guardian or from the department of children's services, or when the decision appealed involves the deprivation of a child's liberty as the result of a finding that such child engaged in criminal activity, such hearing shall be held within forty-five (45) days of receipt of the findings and reports. In its order, the criminal court or circuit court shall remand the case to the juvenile court for enforcement of the judgment rendered by the criminal court or circuit court. Appeals from an order of the criminal court or circuit court pursuant to this subsection (c) may be carried to the court of appeals as provided by law.

-14-

19, 2008, ordering counsel for the parties to coordinate a date for trial "at the Court's earliest opportunity." There is no further mention in the record about a trial date until Father's second motion to set immediate trial dates on April 28, 2009. It appears from Father's second motion and the Redmonds' response that counsel for the parties had difficulty scheduling a mutually agreeable trial date that also coordinated with the court's availability. Father's second motion to set immediate trial dates was heard on May 8, 2009, after which a trial date was set for August 3, 2009, and commenced as scheduled.

We note initially that the application of Tenn. Code Ann. § 37-1-159(c) to the present case is questionable, given that Caleb was not removed from the custody of Father by virtue of the juvenile court's judgment. Rather, Caleb was already in the custody of the Redmonds at the time of the juvenile court's involvement. Caleb went to live with the Redmonds following the death of his Mother, who had previously obtained a restraining order against Father forbidding his contact with Caleb. Thus, when the juvenile court's judgment of dependency and neglect was entered on October 13, 2008, Caleb had not been in his Father's custody for over two years.[6]

Even if the statute applies, we find Father's issue to be without merit because this Court has previously held that the 45 day provision in Tenn. Code Ann. § 37-1-159 is directory in nature and Father has not shown that he was prejudiced by the delay. *See State of Tennessee v. Guinn*, No. 02A01-9607-CV-00152, 1997 WL 15237 (Tenn. Ct. App. Jan. 17, 1997). In *Guinn*, we were asked whether the failure to commence a *de novo* hearing within 45 days as required by Tenn. Code Ann. § 37-1-159 resulted in the dismissal of the case. *Id.* at *2. We noted that "[i]t is a general rule that statutory provisions which relate to mode or time of doing an act to which the statute applies are not held to be mandatory, but are held to be directory only, especially when there is no showing of prejudice to the one seeking to invoke the time limit." *Id.* (citing *Big Fork Mining Co. v. Tennessee Water Quality Control Bd.*, 620 S.W.2d 515, 520 (Tenn. Ct. App. 1981)). We concluded that the 45 day period "relates only to the time for the hearing and does not relate to the merits of the case" and ultimately determined "that the legislature intended the 45 day provision to be directory in nature." *Guinn*, 1997 WL 15237, at *3.

Thus, we believe that Father's issue has merit only if he has shown prejudice. In this case, aside from the inconvenience of the delay itself, the only prejudice that Father alleges

---

[6]Furthermore, we note that Tenn. Code Ann. § 37-1-159(c) provides for a hearing within 45 days of the circuit court's receipt of the juvenile court's findings. While Father filed his notice of appeal to the circuit court on October 22, 2008, nothing in the appellate record indicates when the circuit court received the juvenile court's findings, thus we have not been provided a date from which to start tolling the 45 day period.

stems from the inclusion of Dr. Turnbow's testimony. Father asserts that, if he had received a more timely hearing, Dr. Turnbow would not have been able to evaluate Caleb, thus her testimony regarding Caleb's adjustment to the Redmonds would have been unavailable. This argument fails for two reasons.

First, Dr. Turnbow testified that she first met with Caleb on June 1, 2007. While Father correctly points out that this was more than a year after he filed his first petition in the juvenile court, this initial meeting occurred between hearing dates in the juvenile proceeding. In other words, Dr. Turnbow had already begun her evaluation of Caleb before the juvenile court entered its order of dependency and neglect. It simply would not have mattered whether the *de novo* hearing in the circuit court began sooner because Dr. Turnbow's evaluation did not occur during the supposed delay, but, in fact, began before the juvenile court had entered its judgment.

Second, Dr. Turnbow's testimony, to the extent it was relied on by the trial court, spoke to the best interests of the child, and was irrelevant to the trial court's finding of dependency and neglect. It was uncontested that the Redmonds' home was a suitable environment in which to raise a child and that Caleb was doing well in their custody. Father has only appealed the finding of dependency and neglect, and not custody of Caleb; therefore, any testimony which could arguably be prejudicial was relevant only to an issue which Father does not appeal. Consequently, we conclude that Father was not prejudiced by any delay in the circuit court.

*C. Whether the circuit court erred by hearing adjudicatory and dispositional proof at the same hearing*

As noted above, the statutes governing dependent and neglect proceedings prescribe a two step analysis. First, under Tenn. Code Ann. § 37-1-129, the court is to determine whether a child is dependent and neglected, which is sometimes referred to as the adjudicatory phase. If the juvenile court finds the child to be dependent and neglected by clear and convincing evidence, then it proceeds immediately or at a postponed hearing to make "a proper disposition in the case," i.e., the dispositional phase. Tenn. Code Ann. § 37-1-129(c). Making a "proper disposition" requires the court to make a custody decision "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a).

In this case, at the *de novo* hearing conducted August 3 through August 6, 2009, the circuit court heard proof related to both an adjudication of dependency and neglect and a disposition of custody. Following the conclusion of the hearing, the court took the matter under advisement. On September 9, 2009, the circuit court issued notice of its intent to find

-16-

Caleb dependent and neglected, and provided that, if either party wished to introduce additional dispositional proof, the court would set a further hearing. Father objected to this procedure, arguing that the circuit court impermissibly heard dispositional evidence at the adjudicatory hearing. Father's unstated, but implied, argument was that the dispositional evidence regarding the best interests of Caleb improperly influenced the circuit court's decision to find him dependent and neglected.

We have reviewed the entire record and find this issue to be unsupported by the record. First, the statutory language does not prohibit both the adjudicatory phase and the dispositional phase from occurring at the same hearing. Rather, under Tenn. Code Ann. § 37-1-129(c), once the court finds that a child is "dependent, neglected or unruly, the court shall proceed immediately or at a postponed hearing to make a proper disposition of the case." The statute thus allows for the exact procedure utilized by the trial court. *See also **In re Hannah S.***, 324 S.W.3d 520, 527 (Tenn. Ct. App. Feb. 12, 2010), *perm. app. denied* (Aug. 30, 2010) ("While there are two phases in a dependency and neglect proceeding, it is still only one proceeding."). Moreover, it is within the purview of the trial court to determine how it runs its court, and, absent an abuse of discretion, we will not disturb a trial court's decision in matters of practice. ***Ford v. Roberts***, No. E2007-00088-COA-R3-CV, 2007 WL 4460166, at *6 (Tenn. Ct. App. Dec. 20, 2007). The trial court in this case was permitted to hold both phases at the same hearing. In an abundance of caution, the court held an additional hearing for dispositional evidence. Father has not directed us to any authority forbidding this practice, and we are likewise unaware of any authority to that effect.

Second, there is no indication in the record that the trial court was confused, applied the wrong statute, or improperly considered the evidence. Rather, the record confirms that the trial court was keenly aware of the procedure being utilized, carefully considered a multitude of evidentiary issues, and analyzed separately the issues of dependency and neglect and custody. Moreover, the trial transcript reflects that both parties were aware that evidence was being submitted that was relevant to both phases. While Father made several evidentiary objections, he did not object, at the time of the hearing, to the form of the procedure. Father has asserted that the trial court's judgment reflects its alleged confusion; however, as discussed in more detail below, and aside from a few matters of form and typographical errors, the court's judgment clearly sets out its findings of fact and conclusions of law.

While the better practice is for the trial court to clearly delineate the adjudicatory and dispositional phases, if not in separate hearings, at least in distinct segments, we conclude that it was not error to fail to do so. In a bench trial, a judge is presumed capable of hearing evidence for a certain limited purpose, and making his or her decision based only on relevant, material, and competent evidence. *See, e.g.,* 75B Am. Jur. 2d Trial § 1672 (2011). Moreover, the evidence in cases such as this will sometimes overlap between the respective

phases, and it may serve the interests of judicial economy to hold one hearing rather than repetitive hearings. From the record before us, there is no indication that the trial court failed to properly consider the evidence in making its separate findings. Consequently, we conclude that Father's issue is not supported by the record.

*D. Whether clear and convincing evidence in the record supports the circuit court's findings*

We next turn to Father's contention that the trial court's findings are not supported by clear and convincing evidence. Of relevance, the trial court found:

> In this case, the natural father . . . has had little actual association with the child either as the result of the divorce court order or the actions of the courts in relation to this dependent and neglect action.
>
> It is the inescapable conclusion of this court that by the use of the clear and convincing standard of proof that the Redmonds have established that Caleb should be placed with them as primary custodians.
>
> It has been established [] by clear and convincing proof that if custody was placed with [Father], he would present a danger to Caleb [C.] This conclusion is based upon evidence offered at trial concerning [Father's] history of abuse toward other family members.
>
> There is no doubt in this court[']s mind that the best interest of the child commands that Caleb be placed with the Redmonds as primary custodians.
>
> This court is of the opinion that upon the total proof presented to this court that it has been clearly established by clear and convincing evidence that Caleb [C.] is dependent and neglected under statutory and case law of this State.
>
> The Court is of the opinion that reliable clear and convincing proof exists in that the father has substantially refused to provide parenting responsibilities such as timely payment of support, the natural father's involvement or conduct

-18-

may have an adverse [e]ffect on the child's best interest.

The court further finds that the natural father is not a credible witness before this court based upon the testimony at trial as compared with prior testimony upon material issue[s].

The court finds by clear and convincing proof that the father[']s visitation with his child, Caleb, should be limited and supervised.

The court has heard the opinion of Dr. Charlton Stanley, Ph.D., and other underlying proof. Although the expert is allowed to state one opinion, the trier of fact is not required to accept the opinion.

In this case, the court rejects the opinion of Dr. Stanley that [Father] would not present a danger to Caleb [C.].

We have reviewed the entire record and conclude that the trial court's findings are supported by clear and convincing evidence. Particularly, the evidence of Father's propensity to physically, emotionally, and mentally abuse his family was overwhelming. We see no reason to rehash the evidence detailed above except to note that, over the course of his life, Father has had seven restraining orders entered against him by his mother, his stepfather, his aunt, two of his ex-wives, Janice C. and Mother, and his two children, Madison and Caleb. Extensive and emotional testimony was submitted on these, and many other incidents, and in almost every case the testimony was corroborated by other witnesses. This multitude of abusive episodes was not isolated in nature or confined to any one period of Father's life. Rather, the evidence documented a propensity for violence stretching from his teen years into the instant litigation.

Furthermore, Father's lack of credibility as a witness was especially damaging to his cause. "Where the trial judge has seen and heard the witnesses, especially if issues of credibility and weight to be given oral testimony are involved, considerable deference must be accorded those circumstances on review." *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995) (quoting *Townsend v. State*, 826 S.W.2d 434, 437 (Tenn. 1992)). Father's testimony when called as an adverse party by the Redmonds involved a troubling pattern. He would deny the existence of a fact posed to him and then, when confronted with his conflicting prior testimony, would evade the question or change his answer. His attorney would then stipulate to his former testimony. This rigmarole occurred dozens of times, leading the trial court to state that:

This court has seldom seen a witness more thoroughly impeached and in many instances this court is of the opinion the witness made deliberate false statements. In such circumstances the court will disregard the testimony of [Father] except where it is corroborated by other credible testimony.

The trial court also found problematic other evidence tending to support Father. For example, Father's current wife, Mona C., testified that the two shared a stable, financially secure home. She further testified that Father had never been abusive to her and that she had never seen him be abusive towards anyone else. However, she also indicated that, although she was aware of the extensive allegations of abuse against Father, she did not factor those into her opinion that he would be a good father. While the trial court stopped short of making a specific credibility finding concerning Mona C.'s testimony, it did note the incongruity in her testimony in its findings of fact.

Likewise, Dr. Stanley was of the opinion that Father did not pose a risk to Caleb. However, on examination of Father, it was shown that Father had falsified the questionnaires given to Dr. Stanley. Furthermore, Dr. Stanley had reached his conclusion notwithstanding the fact that certain tests indicated Father may have problems handling the ordinary stresses of life without having "emotional outbursts and impulsive actions." In its findings of fact, the trial court stated, "[t]he Court must express concern here that Dr. Stanley after describing the tests as valuable and generally reliable, chose to ignore or disregard the assessment in Exh[ibit] 25. It seems under Dr. Stanley's testimony that he is qualified to ignore findings seemingly directly on point."

It is well settled that "[e]xpert testimony is not conclusive, even if uncontradicted, but is rather purely advisory in character, and the trier of fact may place whatever weight it chooses on such testimony." *Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001). In this case, the trial court explicitly rejected Dr. Stanley's opinion that Father would not present a danger to Caleb. We discern nothing in the record to make us think otherwise. In sum, the trial court's findings are clearly and convincingly supported by the evidence in the record.

*E. Whether the trial court's findings support a finding of dependency and neglect*

Lastly, Father argues that, even if the trial court's findings of fact are correct, they do not amount to a finding of dependency and neglect. Father's arguments under this issue are essentially twofold: (1) that the trial court did not apply the dependency and neglect statute or make findings relevant thereto; and (2) that the conditions on which the trial court based its finding did not exist at the time of the *de novo* hearing.

As to the first issue, the trial court found Caleb to be dependent and neglected pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(G), which states, in relevant part, that a "'[d]ependent and neglected child' means a child [w]ho is suffering from abuse or neglect." Tenn. Code Ann. § 37-1-102(b)(1) defines "abuse" and states that:

> Abuse exists when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker.

The trial court noted that Tenn. Code Ann. § 37-1-102(b)(1) was broadly drawn to include a child "in immediate danger." The court clearly found that due to Father's "history of abuse toward other family members," he would present a present danger to Caleb if awarded custody. Consistent with this finding, the court also performed an analysis of the best interests of the child in determining custody pursuant to Tenn. Code Ann. § 36-6-106 and specifically found relevant Tenn. Code Ann. § 36-6-106(a)(8) which factors in "[e]vidence of physical or emotional abuse to the child, to the other parent or to any other person."[7]

Father argues that the trial court's judgment focuses too heavily on the best interest of the child at the expense of a foundational finding of dependency and neglect. In other words, Father argues that the trial court put the cart before the horse. We disagree. While Father correctly points out certain errors in the styling of the trial court's judgment, these are errors of style only. For example, the trial court's findings of fact are under a heading that cites to the custody statute, Tenn. Code Ann. § 36-6-106. Father also directs us to what appear to be typographical errors in which the court cites an incorrect statute. Father cites these examples as evidence that the trial court was confused about which statute it was applying.

---

[7]Tenn. Code Ann. § 36-6-106 provides, in relevant part:

> (a) In . . . any . . . proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. The court shall consider all relevant factors, including the following, where applicable:
> . . . .
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person . . . .

We are unconvinced. The trial court set forth a twenty-two page judgment that clearly details its findings of fact and conclusions of law. The court clearly determined both that Caleb was dependent and neglected and that it was in his best interest to remain in the Redmonds' custody. Father's arguments place form over substance and ignore the overwhelming and articulated reasons for the trial court's judgment.

Father next finds fault with the trial court's reliance on historical incidents of abuse, some over thirty years old, and asserts that these cannot be the basis for a finding of dependency and neglect. It is true that the circumstances leading to a finding of dependency and neglect must exist at the time of the *de novo* hearing. *See Green v. Green*, M2007-01263-COA-R3-CV, 2009 WL 348289, at *10 n.13 (Tenn. Ct. App. 2009). This Court has, for example, found that a father's illegal drug use and anger problems occurring two years prior to the hearing did "not appear to be an accurate predictor of his behavior [two years later] and thereafter." *Ray v. Ray*, 83 S.W.3d 726, 736 (Tenn. Ct. App. 2001).

In that case, this Court noted that:

> Custody decisions should not be used to punish parents for past misconduct or to award parents for exemplary behavior. The courts understand that persons are able to turn their lives around. Accordingly, custody decisions should focus on the parties' present and anticipated circumstances, and on the parties' current fitness to be custodians of children.
>
> The courts may and should consider past conduct to the extent that it assists in determining a person's current parenting skills or in predicting whether a person will be capable of having custody of a child. However, the consideration of past conduct must be tempered by the realization that the persons competing for custody, like other human beings, have their own virtues and vices. Biological parents are not required to demonstrate they are perfect before they can be granted custody of their children.

*Id.* at 734 (citations and internal quotations omitted).

Likewise, in the case of *In re D.J.R.*, No. M2005-02933-COA-R3-JV, 2007 WL 273576 (Tenn. Ct. App. Jan. 30, 2007), we vacated the circuit court's finding of dependency and neglect because there was no evidence that the mother had abused alcohol or drugs in the past two years. *Id.* at *6-7; *see also In re Crawford*, No. 02A01-9405-CH-00124, 1995 WL 72615, at *6 (Tenn. Ct. App. Feb. 22, 1995) (concluding that although a father was

previously an unfit parent, the evidence indicated that in the six months before trial he had become a fit parent).

While we are mindful of these precedents, we conclude that the instant case differs from those cited above in two important respects. First, the evidence showed, and the trial court found, such an overwhelming pattern of violence against family members that it presented a current threat to Caleb. In its judgment, the court noted that the "testimony clearly showed a *continued history* of abuse toward others that has been *unrelenting* over a period of years." (Emphases added). In another instance, the court found that Father had "[a] long and *continuing history* of abusive behavior." (Emphasis added). These findings are amply supported by the evidence

Second, and perhaps more importantly, very little evidence was presented that Father had in any way reformed his behavior. Any evidence of remedial behavior came solely from Father's own testimony, which the court found not credible, or from the testimony of his current wife, Mona C., which the court likewise found problematic on this point. Far from remedying his abusive issues, during the pending litigation Father threatened Mr. Redmond stating that "[i]f anybody get in the way of me ever seeing my child Caleb I will see to it that no one ever sees Caleb again"; threatened his family that he would "whip [their] asses" if they interfered with his attempts to get custody of Caleb; "came across a table" at the Redmonds' attorney during a deposition; and threatened to kill his daughter Madison.

These actions are not indicative of a reformation of Father's past conduct. Neither this Court nor the trial court is required to sit idly by and wait for Father to abuse his son where such overwhelming evidence of a propensity for violence is present. We agree with the trial court that Caleb would be in immediate danger if placed in the custody of his Father.

For the reasons discussed above, we affirm the judgment of the trial court. Costs of this appeal are taxed to Appellant, Randall Cregg C., and his surety.

_____
J. STEVEN STAFFORD, JUDGE