# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 23, 2012 Session

## IN RE ALYSIA M. S.[1]

**Appeal from the Circuit Court for Rutherford County**
**No. 62019      Royce Taylor, Judge**

**No. M2011-02008-COA-R3-JV - Filed April 11, 2013**

A couple who had cared for a minor child filed a petition alleging that the child was dependent and neglected.  The juvenile court awarded the couple temporary custody, and after finding that the child was dependent and neglected, directed custody to remain with the couple.  Mother appealed.  Grandparents filed an intervening petition.  After a trial de novo, the circuit court found that the child was not dependent and neglected, dismissed both petitions, and directed the juvenile court to implement Mother and child's reunification.  The couple appealed.  Discerning no error and finding no clear and convincing evidence of dependence and neglect, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and FRANK G. CLEMENT, JR. J., joined.

Brad W. Hornsby and Heather G. Parker, Murfreesboro, Tennessee, for the appellants, Dana and Andrew Mitchell.

Stephen W. Pate, Murfreesboro, Tennessee, for the appellee, Kathryn S.

---

[1]To preserve anonymity in cases involving a minor child, this Court redacts the child's surname and that of any individuals who share it.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

The appellee, Kathryn S. ("Mother"), is six-year-old Alysia's mother.[2] In June 2010, Mother asked her husband's ex-wife, Charlene S. ("Charlene"), to care for Alysia for a couple of weeks to one month. Charlene picked up Alysia and the suitcase Mother had packed for her from Mother's home. A few days later, with Mother's knowledge, Charlene left Alysia with another couple, the Mitchells, so Alysia could attend vacation Bible school at their church while Charlene worked during the daytime.[3] This arrangement was memorialized in a notarized "power of attorney authorization of temporary guardianship" that Mother signed at a June 18, 2010 meeting with the Department of Children's Services ("DCS") to give the Mitchells temporary guardianship of Alysia from June 10, 2010 until January 1, 2011.[4] During that same meeting, DCS tested Mother for drugs. She tested positive for marijuana and, consequently, entered into a non-custodial parenting plan which acknowledged that Alysia would not be living with Mother. The plan required Mother to maintain stable housing and to earn a legal income before Alysia would be returned to her.

After vacation Bible school ended, Charlene and the Mitchells decided that Alysia would be best served by continuing to live with the Mitchells full time rather than with Charlene who worked in Nashville and lived in Dickson, far from the Mitchells' Smyrna home. Via text message, Charlene informed Mother of this decision two days after it was made. Mrs. Mitchell and Charlene each testified that, at the time of their decision, there was no way to contact Mother, a fact corroborated by Mother's own testimony that she neither saw nor spoke with her child in June 2010 because she lacked a telephone and employment, and was experiencing general instability.

On August 26, 2010, the Mitchells filed in the juvenile court a petition for dependency

---

[2]Father Jesse S. is not a party in this appeal.

[3] Charlene had known the Mitchells for several years. Mother first met the Mitchells in September 2010 during the first hearing before the juvenile court.

[4] Apparently, Alysia's grandfather reported Mother to DCS in June 2010 due to concerns about her living conditions. The record is unclear as to how DCS later withdrew from this case. Mother testified as to her attempts to contact DCS and unreturned telephone calls. Mrs. Mitchell explained that she turned to the juvenile court "based on the history with DCS, and [Mother] and I both agreed that they were not handling it properly with their communication . . . I wanted the Court to hear it."

and neglect requesting temporary custody[5] of Alysia and requesting full custody of her after the dispositional hearing, "with steps put in place for Mother to reobtain custody of [Alysia]." From October through November 2010, the juvenile court held three adjudicatory hearings in which Mother, Mrs. Mitchell, Mr. Mitchell, Mother's friend, a child protective services worker from DCS, a clinical therapist from the Sexual Assault Center, and the program director of the Murfreesboro Exchange Club Family Center testified. A guardian ad litem represented Alysia's interest.

By order entered January 21, 2011, the juvenile court found Alysia to be a dependent and neglected child, awarded the Mitchells custody and full decision-making authority, removed Mother's superior parental rights, and gave Mother limited, supervised visitation and telephone calls with the child. In its ruling from the bench, the juvenile court noted that Mother's credibility was "absolutely zero," that the Mitchells and their supporting witnesses had shown "great credibility," and that the finding of dependency and neglect was proven by clear and convincing evidence pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(F) and (G).[6] The juvenile court specifically found that the evidence supporting dependence and neglect included Mother's "constant lies," testimony that Alysia was present in the home when Mother and her friend would smoke marijuana, the "immoral" photographs Mother posted on her MySpace profile, and the fact that Mother "totally abandoned" Alysia by leaving her with Charlene and by not visiting Alysia once she knew Charlene left her with the Mitchells.

Mother appealed to the circuit court. On March 3, 2011, Mother's parents (Alysia's grandparents) filed a motion to intervene requesting that they be allowed to file a separate petition for dependency and neglect regarding Alysia. This was permitted by agreed order entered April 8, 2011.

The circuit court conducted hearings de novo on the Mitchells' and the grandparents' petitions on April 18, May 9, May 12, and June 6, 2011. Mother, Charlene, Mrs. Mitchell,

---

[5] Following a September 15, 2010 probable cause hearing and by order entered October 14, 2010, the juvenile court found "probable cause to believe that [Alysia] is dependent and/or neglected and is in need of supervision from the Court," and accordingly gave the Mitchells continuing temporary custody and awarded Mother supervised visitation and pre-scheduled monitored telephone calls with the child.

[6] Tennessee Code Annotated section 37-1-102(b)(12) lists ten grounds upon which a court may find a child dependent and neglected. Pursuant to subsection (F), a child is dependent and neglected when the child "is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others." Pursuant to subsection (G), a child "[w]ho is suffering from abuse or neglect" is a dependent and neglected child.

Mr. Mitchell, the grandmother, and the grandfather testified.[7]  Following the close of all proof, the circuit court made the following relevant findings and rulings from the bench:

> Now, let me go over the order from juvenile court.  And I'm going to take issue with some of these things based on what I think the law is.  There were three findings.  First, that [Alysia] is a dependent/neglected child.  Two, that the proper disposition of [Alysia] is to have petitioners, [the Mitchells], awarded custody of said child.  And three, this finding removes from [Mother] her superior parental rights.  Let me start with the last one.  And I talked about this case, this Chinese adoption, it's *In re Adoption of A.M.H.*, Supreme Court of Tennessee.[8]
> . . .
>
> It's not a dependent/neglect case.  But the [Supreme] Court says this about superior parental rights.  It said, "[a]bsent, extraordinary circumstances, parents are not entitled to superior rights when seeking to modify a valid order placing custody with a non-parent, even when that order resulted from the parent's voluntary relinquishment of custody to the non-parent.  Despite this rule, we have recognized four circumstances in which a natural parent continues to enjoy a presumption of superior rights to custody . . . ."  And number 4 is when the natural parent seeds [sic] only temporary and informal custody to the non-parents.[9]
>
> And in this particular case, in June of last year, it appears that [Mother] had some serious problems, and she gave up temporary custody, and [gave] informal custody to non-parents.  Now, then there comes the position of this second thing I wanted to get into, is the proper disposition.  And I don't think the juvenile court had authority to grant this disposition that they did.  I think the court exceeded its authority under 37-1-130, disposition.  We talked about this earlier.  And the only disposition I find in here that would be applicable to an individual is, after there has been a study by the probation officer and other person or agency designated by the court, as found by the court to be

---

[7] The testimony presented at the circuit court hearings will be discussed in further detail below as relevant to the issues on appeal.

[8] *In re Adoption of A.M.H.*, 215 S.W.3d 793 (Tenn. 2007).

[9] *Id*. at 811.

qualified to [receive] and care for the child.[10]  And I think that applies in this case.  I don't think the Mitchells, that step was ever taken, to find that these–they're non-related.  And the [juvenile] court did not go through the proper process to find that they were properly designated to be the custodial parties to be awarded this child.

And the third and last thing is this dependent/neglected issue.  Now . . . all our proof has been focused on dependent/neglect.  And I keep going back to the definitions.  Okay.  There are definitions of (A) through (J) for dependent/neglect.[11]
. . .

(B) is one [ground for finding that a child is dependent and neglected] that was raised–and I'm not going to read all of it–but just basically what was stated, the parent with whom the child lives by reason of cruelty, mental incapacity, immorality, or depravity is unfit to properly care for the child.  And that's one that's raised.  I'm going to discuss that in a minute.
. . .

(F) says, who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child.  And (G) is who is suffering from abuse or neglect.

Now abuse[12] is defined, interestingly enough, by statute, and neglect isn't.
. . .

Neglect is not specifically defined, but there are cases that would indicate neglect where children are in serious danger of being injured.
. . .

---

[10] Tenn. Code Ann. § 37-1-130(a)(2)(A).

[11]  Tenn. Code Ann. § 37-1-102(b)(12)(A)-(J).

[12] Tenn. Code Ann. § 37-1-102(b)(1) states that:
> "[a]buse" exists when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker.

So, we fall back on immorality or depravity. And there has been some proof put on about this issue. But I've got a problem with proof in that when we have divorce cases, we have a lot of cases that involve immoral conduct. But the Court of Appeals has instructed us that unless that has some effect on the child, that's not a basis for awarding custody to the other parent. So, even where we have a parent guilty of adultery, which is immoral conduct, that parent can still get custody of the child if that has not affected the child. And I don't find that the Mother, what she was doing and all, has any–there has been no showing of any connection with any problem with the child.

So I think what's really happened here, the Mother realized she couldn't take care of the child for a while and sought help. She didn't take care of her problems right away, and still has problems. I don't think there's any issue but she still has problems. But I don't think that falls under the category of dependent/neglect which would remove her superior rights as a parent under these particular circumstances. There has got to be some clear and convincing evidence that really takes away her superior rights as a parent in this situation, I think. And I just don't think it's here.
. . .

So, I'm going to order that this matter be remanded back to juvenile court. And I'm going to use the same language that's used in this Chinese adoption case. Obviously, this child has some issues in getting re-united with her Mother because of the time that's been involved and the matters that have been going on with the various care providers and counselors. I haven't heard all of that yet, but certainly there are some issues there. So, the juvenile court can consider that.
. . .

So, I think re-unification is appropriate, but there still has to be some work to make that happen.

By order entered August 19, 2011, the circuit court dismissed both petitions for dependency and neglect, set aside the juvenile court's January 21, 2011 order, and reinstated Mother's superior parental rights. The court found no clear and convincing evidence of dependence and neglect, found that "reunification with Mother is appropriate," and directed the juvenile court "to consider, prepare, and implement a plan to resolve the pending custody matter with a view toward reunification of the child . . . with her Mother in manner that minimizes trauma to said child."

-6-

The Mitchells appealed.

## ISSUES

The Mitchells present three issues for our review: (1) whether the circuit court erred in not conducting a de novo hearing and in not separating the dispositional aspect of the case from the adjudicatory phase of the proceedings; (2) whether the circuit court erred in finding that Alysia was not a dependent and neglected child pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(B), (F), and/or (G); and (3) whether the circuit court erred in finding that, for Alysia to have been neglected per Tenn. Code Ann. § 37-1-102(b)(12)(B), Mother's immorality must have had a "connection with any problem with the child."

## STANDARD OF REVIEW

The juvenile court is vested with "exclusive original jurisdiction" to hear allegations that a child is dependent and neglected. Tenn. Code Ann. § 37-1-103(a)(1). Dependency and neglect proceedings are conducted in two phases. First, the court must hold a hearing and make findings as to whether a child is dependent and neglected. Tenn. Code Ann. § 37-1-129(a)(1). If the juvenile court finds by clear and convincing evidence that the child dependent and neglected, then, pursuant to Tenn. Code Ann. § 37-1-129(c), the court "shall proceed immediately or at a postponed hearing to make a proper disposition of the case." Making a "proper disposition" requires the court to make a custody determination "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a).

Pursuant to Tenn. Code Ann. § 37-1-129(c), dependency and neglect must be proven by clear and convincing evidence, that is, evidence that "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* In contrast to the preponderance of the evidence standard, clear and convincing evidence should show that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

By statute, in a dependency and neglect case, the circuit court is to hear any appeal from the juvenile court, and in so doing, "shall hear the testimony of witnesses and try the case de novo." Tenn. Code Ann. § 37-1-159(a). On appeal, the entire juvenile court record must be provided to the circuit court, Tenn. Code Ann. § 37-1-159(c), but the circuit court

may not rely solely on that record; rather, in trying the case de novo, the circuit court must "render[] an independent decision based on the evidence received in the circuit court proceeding." *In re M.J.B.*, 140 S.W.3d at 651.

A de novo trial is "[a] new trial on the entire case–that is, on both questions of fact and issues of law–conducted as if there had been no trial in the first instance." *Kissick v. Kallaher*, No. W2004-02983-COA-R3-CV, 2006 WL 1350999, at \*3 (Tenn. Ct. App. May 18, 2006) (quoting BLACK'S LAW DICTIONARY (8th ed. 2004)). Therefore, the circuit court does not "review" the juvenile court's decision, but instead conducts a new proceeding as though the case was originally filed in circuit court.

We review the trial court's specific factual findings in support of the ultimate issue de novo with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *see In re H.L.F.*, 297 S.W.3d 223, 233 (Tenn. Ct. App. 2009). The ultimate issue of whether dependency and neglect has been proven by clear and convincing evidence is a question of law which we review de novo without a presumption of correctness. *In re H.L.F.*, 297 S.W.3d at 233.

ANALYSIS

I.

First we examine the Mitchells' procedural issue, that is, whether the circuit court held a de novo hearing and whether the court erred in failing to separate the adjudicatory and dispositional phases of the proceeding.

The Mitchells argue that "[t]he court's indication that it was making its ruling based on and in opposition to the juvenile court's ruling indicates that the circuit court failed to hold an independent hearing." We reject this argument. We have studied the eight-volume transcript of the circuit court hearings, and it clearly shows that the circuit court conducted a four-day de novo trial in which it considered the testimony of six witnesses, the arguments of four attorneys, and numerous exhibits.[13]

The Mitchells further take issue with the fact that, in its colloquy from the bench, the circuit court discussed whether the juvenile court should have placed Alysia with the

---

[13] The circuit court heard *new* evidence (which we will discuss below) of changes Mother made in her life since the juvenile court hearings. This fact further demonstrates that the circuit court trial was indeed de novo.

Mitchells in the first place and *In re Adoption of AMH*[14] before ruling on the issue of dependency and neglect. As to the Mitchells' contention that the circuit court "intertwined" its rulings, we note that, "[i]n a bench trial, a judge is presumed capable of hearing evidence for a certain limited purpose, and making his or her decision based only on relevant, material, and competent evidence." *In re Caleb L.C.*, 362 S.W.3d 581, 596 (Tenn. Ct. App. 2011) (Tenn. R. App. P. 11 application denied).

The Mitchells correctly assert that there are two phases to a dependency and neglect proceeding. As detailed above, these are the adjudicatory phase in which the court determines whether a child is dependent and neglected pursuant to Tenn. Code Ann. § 37-1-129(a)(1), and the dispositional phase where the court "proceed[s] immediately or at a postponed hearing to make a proper disposition of the case" under Tenn. Code Ann. § 37-1-129(c). Making a "proper disposition" requires the court to make a custody determination "best suited to the protection and physical, mental and moral welfare of the child." Tenn. Code Ann. § 37-1-130(a). If, as in this case, the court finds that the child is not dependent and neglected, then the court lacks jurisdiction to determine custody and must dismiss the petition. *See Green v. Green*, No. M2007-01263-COA-R3-CV, 2009 WL 348289, at *5 (Tenn. Ct. App. Feb. 11, 2009) (citing Tenn. Code Ann. § 37-1-129(a)(1)).

This Court has recently instructed that in a dependency and neglect case "the better practice is for the trial court to clearly delineate the adjudicatory and dispositional phases, if not in separate hearings, at least in distinct segments . . . ." *In re Caleb L.C.*, 362 S.W.3d at 596. Failing to do so does not necessarily constitute error. *See id*. More importantly, and as the Mitchells conceded in oral argument, the circuit court's discussion of juvenile court's order while ruling from the bench was not in error because, in its order, the court found "*no clear and convincing evidence* [Alysia] is dependent and neglected." (Emphasis added). The court, therefore, never reached the dispositional phase. Instead, the court followed proper procedure in dismissing both petitions for dependency and neglect, pursuant to Tenn. Code Ann. § 37-1-129(a)(1), and remanding the case to the juvenile court to enforce the circuit court judgment, pursuant to Tenn. Code Ann. § 37-1-159(c).

We conclude that the circuit court conducted a procedurally sound de novo hearing in this case.

## II.

Moving to the heart of this matter, the dispositive issue is whether, at the time of the de novo circuit court trial, the Mitchells proved, by clear and convincing evidence, at least

---

[14] *See supra*.

one of the statutory grounds for dependency and neglect alleged in their petition.

The Mitchells alleged that Alysia was "suffering from abuse or neglect" pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(G). Mrs. Mitchell testified that, once during bathtime, Alysia told her that her half-sister[15] "licked her bootie," and indicated that she was referring to her vagina. Mrs. Mitchell testified that she reported Alysia's disclosure to DCS and described the resulting DCS investigation as follows:

> Q. And to the best of your knowledge, that investigation has or has not been completed?
>
> A. I don't know anything about the investigation, because the only thing that I did was, I got a, whenever I first called it in to DCS, they scheduled an appointment for Alysia to go in and see a forensics investigator person. And so, we went there. And then to be honest, I never heard back at all from DCS about the case.
>
> Q. Was it also revealed to [Alysia's] therapist?
>
> A. Yes, sir.
>
> Q. And what is the therapist's name?
>
> A. Laurie Myers.
>
> Q. That's the same one you talked about earlier? There's not more than one therapist is there?
>
> A. No. The DCS forensics investigator was just a one time deal. I guess that's how DCS does it. But we followed up with the Sexual Assault Center with Laurie Myers.

No additional evidence was presented to establish that DCS took any further action on Mrs. Mitchell's report about Alysia's possible abuse, and Alysia's therapist did not testify before the circuit court.

There is no clear and convincing evidence that Alysia suffered direct or indirect abuse or neglect by Mother. We have examined the limited evidence proffered to the circuit court

---

[15] Alysia's grandparents have adopted her half-sister and have legal custody of her.

on this issue, and it is neither clear nor convincing. Accordingly, we find that Tenn. Code Ann. § 37-1-102(b)(12)(G) is inapplicable to this case.

Tennessee Code Annotated section 37-1-102(b)(12)(B) states in relevant part that a child "[w]hose parent . . . by reason of . . . immorality . . . is unfit to properly care for such child" is dependent and neglected. Pursuant Tenn. Code Ann. § 37-1-102(b)(12)(F), a child is dependent and neglected when the child "is . . . under such improper guardianship or control as to injure or endanger the morals or health of such child or others." As the circuit court implied in its colloquy, much of the evidence adduced in the de novo hearings involved Mother's alleged immorality. The Mitchells zealously gathered and presented past postings from Mother's social networking pages such as photos of her in various states of undress next to references to "private parties" and bringing other "hot chicks." The postings, argue the Mitchells, "seem to indicate that [Mother] may be involved in some form of prostitution." This bare allegation is unconvincing, and Mother testified that she had never worked topless, or in the sex industry, or in any form of prostitution, that she no longer organized parties, and that she had never organized parties involving sex. Mother attempted to delete her social networking pages that contained the photos, though they were discoverable on the internet at the time of the circuit court hearing. More importantly, the record contains no evidence that young Alysia had seen or knew about Mother's past internet postings. In this case, we cannot simply assume that she will be exposed to them in the future, nor can we predict the effect, if any, such exposure would have on her morals. The Mitchells' assertion that "the photos speak for themselves" does not amount to clear and convincing evidence of Mother's unfitness to properly care for her child or of any injury or danger to Alysia's morals.

The Mitchells also fault the circuit court's reasoning behind the ruling on Mother's alleged immoral conduct and its relation to a finding of dependency and neglect. They interpret the court's language to amount to an imposition of an "actual harm to the child" standard. The circuit court reasoned:

> So, even where we have a parent guilty of adultery, which is immoral conduct, that parent can still get custody of the child if that has not affected the child. And I don't find that the Mother, what she was doing and all, has any–there has been no showing of any connection with any problem with the child . . . . There has got to be some clear and convincing evidence that really takes away her superior rights as a parent in this situation, I think. And I just don't think it's here.

The Mitchells correctly note that Tenn. Code Ann. § 37-1-102(b)(12)(B) requires proof of the parent's behavior and that Tenn. Code Ann. § 37-1-102(b)(12)(F) requires only that the child's morals be endangered, as opposed to actually compromised. *Lovell v. Lovell*,

No. M2005-02955-COA-R3-CV, 2007 WL 34826, at *4 (Tenn. Ct. App. Jan. 4, 2007). As it plainly stated, the circuit court was looking for clear and convincing evidence of the two statutory grounds alleged such that would strip Mother of her superior parental rights to Alysia. *See*, e.g., *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002) (The presumption of superior parental rights recognizes that "parental rights are superior to the rights of others and continue without interruption unless a biological parent . . . forfeits his or her parental rights by some conduct that substantially harms the child."). We conclude that the evidence in the record does not rise to this level.

The Mitchells also sought to prove that the conditions existing at the time of the juvenile court hearing still existed at the time of the de novo trial and supported a finding of dependency and neglect.[16] For example, the Mitchells presented ample evidence that, in the past, Mother jumped from house to house and from job to job. By the time of the circuit court hearing, however, Mother had been employed steadily for five weeks, was working two jobs, had purchased a car, and had acquired better, more stable housing. Mother explained her previous statements about not being ready to care for Alysia:

Q. With regards to the first time that you said you weren't able to take care of your child, what assumptions were you working under? Was it a mental concern; was it a financial concern? What was going on in your mind when you made that statement, or what piece was missing in your mind when you made that statement?

A. I was worried about finding a job and not having a vehicle to look for work.

Q. Okay. And was that true in June, last year [2010]?

A. I didn't have a vehicle to look for work. I needed someone to watch her while I looked for work.

Q. And the second time you made that statement was in July?

A. I was in the same situation.

Q. You were in the same situation. The third time you made that statement, last week, were you under that same impression?

---

[16] Nine months passed between the beginning of the juvenile court proceedings and the end of the circuit court trial.

A. No, sir. I'm working and everything. I was worried about somebody watching [Alysia] while I worked.

Q. And what has changed since the last time you made that statement?

A. My family are ready to watch her or babysit her while I work.
. . .
Q. Okay. So would you say that you and your parents reconciled or have chosen to reconcile to bring this child back into your life?

A. Oh, yes. We reconciled a long time ago.

In corroborating Mother's testimony, Alysia's grandfather testified that if Alysia were back in her Mother's care, he and his wife would support Mother "one hundred percent financially." He described the self-improvement Mother had demonstrated:

Q. Okay and you feel that she has gainful employment now?

A. Yes. And she has made a lot of strides. She's got a long way to go, but she's definitely improving from what she was June of [2010]. That wasn't her norm even then. She wanted to get ahead in life. I don't know what happened. Everything just fell apart.

Even Mr. Mitchell testified that Mother had "made changes" and that he was "glad to see her taking steps . . . and glad to see her bettering herself." When asked whether he could tell the circuit court any reason why, as of the hearing date, Mother is unfit to parent Alysia, Mr. Mitchell responded, "I mean, that's essentially the reason that we're here, is that [Mrs. Mitchell and I] didn't feel that it was best for us to make that judgment call, that we needed to let the experts do that."

The extent to which Mother smoked marijuana was also raised before the circuit court. Mother admitted that she perjured herself[17] during her juvenile court testimony and that, at that time, she was smoking marijuana daily. Her MySpace profile was littered with animated or cartoon-like cannabis photos. We cannot accept the Mitchells' argument that Mother "has provided no proof that she has ceased her admitted daily use of illegal drugs." Their

---

[17] Before Alysia's grandparents testified, the circuit court voiced serious concern as to Mother's credibility. Unlike appellate courts, trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991).

argument is irrelevant because the Mitchells, as petitioners, not Mother, bore the burden of proof throughout these proceedings. Also, the evidence in the record does not support the Mitchells' argument. Mother testified that, since the meeting with DCS in which she tested positive for marijuana, she had passed random drug screens, attended weekly celebrate recovery meetings, had been working with a sponsor, and was trying to become a sponsor herself. Alysia's grandfather testified that he took Mother to random, employer-mandated drug screenings during the time of the circuit court hearings in April, May, June, and July 2011 and that she went voluntarily. No party introduced the drug screening results and the circuit court did not make a finding as to Mother's drug use. As to this issue, we do not find evidence in the record that would clearly and convincingly establish Alysia's dependence or neglect.

CONCLUSION

Though we agree with the circuit court that Mr. and Mrs. Mitchell have gone above and beyond to take in, care for, and protect a child who is not their own, for the reasons discussed above, we affirm the circuit court's judgment. Costs of appeal are assessed against the appellants, Dana and Andrew Mitchell, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE