IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 24, 2014 at Knoxville

## CHRISTOPHER FIELDER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 08-03221    John W. Campbell, Judge**

**No. W2013-02252-CCA-R3-PC  -  Filed August 22, 2014**

The Petitioner, Christopher Fielder, appeals from the Shelby County Criminal Court's denial of post-conviction relief, contending that he received the ineffective assistance of counsel at trial. Specifically, the Petitioner alleges that trial counsel failed to request a jury instruction on merger of the offenses, tasking it with determining whether the kidnapping of the victim was beyond that necessary to complete the especially aggravated robbery. After considering the record and the applicable authorities, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Christopher Fielder.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Greg Gilbert, Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arose from the December 28, 2007 robbery and kidnapping of Jason Seitz (the victim). The Petitioner and his two co-defendants, Korry Hernandez and John Karcher, were indicted on May 13, 2008, for the especially aggravated robbery and especially aggravated kidnapping, both Class A felonies, of the victim. The Petitioner was later tried and convicted of both offenses by a Shelby County jury on March 25, 2009. The trial court sentenced the Petitioner to serve twenty years for each conviction, concurrently, for an

effective twenty-year sentence. See State v. Christopher Fielder, No. W2009-01663-CCA-R3-CD, 2011 WL 3689134, *1 (Tenn. Crim. App. Aug. 22, 2011), perm. app. denied, (Tenn. Dec. 13, 2011). The Petitioner then appealed to this court, challenging the sufficiency of the evidence and "arguing that (1) the trial court improperly applied enhancement factors; (2) the trial court erroneously failed to apply appropriate mitigating factors; and (3) his sentences are excessive and disproportionate when compared with the sentences received by his co-defendants." Discerning no error, this court affirmed the Petitioner's convictions and sentences; our supreme court declined to review this court's determination. See id.

The following factual background for the Petitioner's convictions was provided in this court's opinion on direct appeal.

The victim, Jason Seitz, testified as follows. On December 28, 2007, Mr. Seitz went to Korry Hernandez's house in Memphis to sell cocaine to John Karcher a/k/a "Droopy." The sale occurred outside the house in Mr. Seitz's car and he left. Approximately two hours later, Mr. Karcher called the victim again and asked him to bring more cocaine. The victim returned in about thirty minutes and honked the horn to have Mr. Karcher come outside for the transaction. A woman came out and told the victim the men were gone but would return soon, and invited the victim to come inside. Since he had known Mr. Karcher for some time, the victim went inside and waited.

Soon, Mr. Karcher, [the Petitioner], and Korry Hernandez arrived. They went into the kitchen. Mr. Hernandez stated he did not like the quality of the drugs previously brought, and wanted a "tax" for allowing Mr. Seitz to use Mr. Hernandez's scales for weighing the cocaine. In order to avoid further confrontation, Mr. Seitz tossed some cocaine down and started to leave the house. [The Petitioner] locked the door and blocked Mr. Seitz's access to the doorway. The victim made a statement to the effect of "what's going on" and was struck by an object in the back of his head. The victim went down on his knees, and all three of the other men "jumped" on him and commenced to repeatedly kick and hit him. As the assault continued to take place, the men threatened the victim, asked him where the rest of his money was, threatened to kill his family, and took all of his money in his pockets plus his car keys, drugs, wallet, identification, and his shoes. Despite the victim's pleas to stop, [the Petitioner] and the other two men continued the assault.

At Mr. Hernandez's instruction, [the Petitioner] brought an electric circular saw, referred to by the witnesses by a brand name, "Skil" saw, to Mr. Hernandez. While Mr. Karcher was on top of the victim on the floor, [the

Petitioner] held down the victim's arm. Mr. Hernandez plugged the saw into an electrical outlet and turned it on. Mr. Hernandez then threatened to cut off the victim's hand. When the victim was able to pull his arm away from the saw, Mr. Hernandez threatened to cut the victim's face while holding the turned-on "Skil" saw near the victim's head.

By this time, the victim was bleeding profusely. Someone put a pillowcase over his head to keep the blood from spreading. This obstructed his vision, but the victim added that "[m]y eyeball had already popped out [of] the socket and my whole ocular bone was broke. I couldn't see anyway." With the pillowcase still on his head, the victim was taken outside and put into the back seat of his own vehicle, a 2004 Jaguar. Mr. Karcher restrained the victim in the car. The victim was then driven away. He complained that his ribs were broken and he could not breathe. Mr. Karcher continued to hit the victim on the head and told the victim he was "about to die." Eventually, the car stopped and the victim was thrown out. The victim stated he could hear all three men talking. He was kicked and hit some more after being thrown from his car, and then his car was driven away. The victim went to a house and "banged" on the door and told the woman there to call an ambulance. The victim [lay] on the porch until the ambulance arrived and took him to Methodist Hospital North where he was treated for his injuries.

The victim testified that as a result of the attack upon him by [the Petitioner], Mr. Hernandez, and Mr. Karcher, he received twenty-two staples in his head, he had a dislocated jaw, a broken ocular bone, (his eye actually "came out"), a broken rib, and he passed blood in his urine for approximately one month. Regarding pain, the victim said that for the first week after the incident, he was confined to the couch; "everything" was sore–his head, chest, neck, back, ribs, and he also hurt internally.

Because [the Petitioner] and the co-defendants threatened the victim and his family, and because the victim was scared that he might be prosecuted for selling drugs, he initially lied to police officers about how he was injured. When confronted by officers that his story did not "add up," the victim then told the truth. He identified [the Petitioner] and the co-defendants from photograph line-ups presented to him, and identified [the Petitioner] at trial.

Heather Bierbrodt, keeper of the patient records for Methodist Hospitals in Memphis, brought a copy of the victim's medical records which was made an exhibit at trial. She testified, concerning injuries noted in the records, that

the victim had a contusion of the face, an orbital fracture, a laceration to his scalp, and a contusion to his scalp.

Officer Tyont Shabazz of the Memphis Police Department testified that he and his partner pulled over, and then chased, two individuals who were in the victim's Jaguar vehicle on the night of December 28, 2007. After receiving a dispatched broadcast of the stolen vehicle and general direction it was believed to be traveling, Officer Shabazz parked and waited. They saw the vehicle, pulled in behind it, and confirmed through the license plate number that it was the vehicle reported as stolen. They turned on the blue lights and the Jaguar, with two occupants, came to a stop. However, just after Officer Shabazz exited his patrol car, the Jaguar took off. An ensuing chase resulted in the Jaguar wrecking through a fence at an apartment complex. The two occupants, including [the Petitioner], ran off in different directions. The officers gave chase and momentarily lost sight of [the Petitioner], but ultimately found him out of breath in a stairwell to a basement door at a church. [The Petitioner] was taken into custody. No money or drugs were found in [the Petitioner]'s possession.

John Karcher, one of the co-defendants, testified that he was guilty of especially aggravated robbery and especially aggravated kidnapping of the victim. Mr. Karcher stated that he had accepted an effective sentence of "13.5 years at 100%" for his truthful testimony in [the Petitioner]'s trial. Mr. Karcher had known the victim for about a year prior to the crimes, and had previously bought cocaine from the victim. Mr. Karcher called the victim both times on the day of the incident. After the victim came inside the house on his second trip there to sell cocaine, [the Petitioner] and Mr. Hernandez returned to the house. The victim and Mr. Hernandez went into the kitchen. They were arguing about the cocaine previously supplied and Mr. Hernandez said he wanted the victim to pay a "tax" on the use of Mr. Hernandez's scales. The victim threw a bag of cocaine and started to leave. [The Petitioner] then locked the door and Mr. Hernandez hit the victim in the back of his head. All three men then started punching and kicking the victim while he was down on the floor.

[The Petitioner] took money and keys out of the victim's pockets. Mr. Hernandez grabbed a "circular saw" and instructed [the Petitioner] to hold down the victim's hand. Mr. Hernandez turned on the electric saw and held it in a threatening manner toward the victim. Someone put a pillowcase over the victim's head and placed the victim into the back seat of his car. Mr. Karcher

and Mr. Hernandez left with the victim in the victim's car. [The Petitioner] followed as a passenger in a car driven by Mr. Hernandez's sister, who was also at the house. Mr. Hernandez was driving the victim's car and Mr. Karcher was in the back seat with the victim. After driving for a while, they stopped and put the victim out of his vehicle. Then [the Petitioner] and Mr. Karcher swapped vehicles they were riding in, so that [the Petitioner] left as a passenger in the victim's vehicle. Mr. Karcher stated that he saw "a lot of [the victim's] blood" on the floor at the house. He reiterated that all three men were kicking and punching the victim at the house.

The other co-defendant, Korry Hernandez, also testified under the same plea agreement terms and conditions as Mr. Karcher. Mr. Hernandez also admitted that he was guilty of the crimes. Mr. Hernandez's testimony was very similar to the testimony by Mr. Karcher. Mr. Hernandez admitted hitting the victim in the back of the head with brass knuckles after the victim pushed [the Petitioner] when [the Petitioner] had locked the door and was blocking the victim's access to the door. Mr. Hernandez confirmed that all three men were kicking and punching the victim while he was down on the floor. He stated that there was a lot of blood on the floor and he got a towel to clean it up. Mr. Hernandez admitted that he turned on the electric Skil saw to frighten and threaten the victim while Mr. Karcher lay on top of the victim and [the Petitioner] stepped on the victim's hand to hold it down. Mr. Hernandez acknowledged that they took the victim's money, cocaine, keys, and his cell phone. Mr. Hernandez also confirmed the other witnesses' testimony about taking the victim away, putting him out of his car, leaving in the car, the police chase, and the wreck.

John Poindexter, an officer with the Memphis Police Department, testified that he was the case investigator in the victim's case. In the course of the investigation, he interviewed the victim. In particular regard to the victim's injuries, Officer Poindexter testified that when the victim had to sneeze, he covered his injured eye because the medical staff had advised him that the action of sneezing could cause his eye to come out again. He also observed that the victim had "twenty-four [sic] staples that closed the wounds to his jaw which was also dislocated below his left eye." Officer Poindexter stated that the victim picked out [the Petitioner] and the co-defendants from three separate photo line-ups (one for each perpetrator). He also interviewed [the Petitioner] and took a written statement from him. [The Petitioner] admitted in the statement that he was present when the victim was robbed and kidnapped, but denied any involvement in the incident. In [the Petitioner]'s

words, "I witnessed it, but I didn't participate." [The Petitioner] did not mention Mr. Hernandez in his statement to police. [The Petitioner] told police that "Droopy" (Mr. Karcher) was the only person who hit the victim. [The Petitioner] stated that Mr. Karcher hit the victim in the back of his head with brass knuckles, and also kicked him a few times. [The Petitioner] stated that Mr. Karcher took the stuff out of the victim's pockets, put a pillowcase over the victim's head and shoved the victim into the back seat of the victim's car, and drove off. He told the police about getting into the victim's vehicle after the victim had already been tossed out, the police chase, and being apprehended by the police. [The Petitioner] acknowledged that at the house, "[a]t one point I was standing in front of the door. I think I checked to see if it was locked and natural instinct to block it so the guy [the victim] couldn't get out."

The State rested its case at the conclusion of Officer Poindexter's testimony. [The Petitioner] testified in his defense as follows. He was at Korry Hernandez's house on the day the victim was robbed. [The Petitioner] had been there since spending the previous night at the house. Also present was Mr. Hernandez, Mr. Hernandez's sister, and Mr. Karcher. They had been "partying," consuming beer, whiskey, marijuana, and cocaine. [The Petitioner] had known Mr. Hernandez for quite a few years, and had met Mr. Karcher a week or so before the incident involving the victim. The victim brought cocaine, left, and some time later was called and asked to bring more cocaine. [The Petitioner] was temporarily away from the house when the victim came the second time. He locked the door because there was "drugs in the house." He heard Mr. Hernandez and the victim arguing. [The Petitioner] testified that he walked to the front door as the victim was headed toward the door. [The Petitioner] stated that he was planning to unlock the door for the victim, but the victim became aggressive and pushed [the Petitioner]. Mr. Hernandez then came running toward the victim. The victim hit the ground, and Mr. Karcher and Mr. Hernandez kicked and beat the victim. [The Petitioner] added that "I don't remember exactly whether I physically beat him or not." [The Petitioner] did not deny beating the victim, and he did acknowledge that he "might" have beat the victim.

[The Petitioner] admitted in his testimony that he stepped on the victim's hand while the Skil saw was being used. [The Petitioner] denied taking any property from the victim. [The Petitioner] confirmed that the victim was placed into the back seat of his own car, and Mr. Karcher also got into the back seat and Mr. Hernandez drove the victim's car. Mr. Hernandez told his

sister to follow them. [The Petitioner] testified that he got into the car with Mr. Hernandez's sister because "[i]t's not really my house. I wasn't really supposed to stay there. I suppose I could have taken off walking or something."

[The Petitioner] described how Mr. Karcher dropped the victim out of the victim's car and then the car was driven away with only Mr. Hernandez and Mr. Karcher inside. The two vehicles went to a gas station, and [the Petitioner] got into the victim's car along with Mr. Hernandez, and Mr. Karcher got into the other vehicle. He then testified that he did not tell the police about Mr. Hernandez's involvement in his ([the Petitioner]'s) statement to the police because the police did not already know about Mr. Hernandez being involved. During cross-examination, [the Petitioner] admitted the he had made sure the front door of the house was locked and stood at the door to make sure the victim could not escape. [The Petitioner] also admitted holding down the victim's hand so Mr. Hernandez "could scare him" with the Skil saw. [The Petitioner] confirmed that money (at least $100.00), keys, and "maybe" a cell phone were taken from the victim.

Id. at *1-5.

After his convictions were affirmed on appeal, the Petitioner filed a petition for post-conviction relief. Counsel was appointed, and two amended petitions were filed, alleging numerous bases for relief.[1] In the second amended petition, the Petitioner argued that trial counsel was ineffective for failing to seek a merger of the Petitioner's offenses and request a jury instruction requiring the jury to determine whether the kidnapping was incidental to the robbery. An evidentiary hearing was held on August 2, 2013. The following evidence, relevant to this appeal, was presented at that hearing.

The Petitioner agreed that his convictions in the instant case arose out of a "drug deal gone bad." He testified that he entered the home of one of the co-defendants and that the victim was inside. The Petitioner explained that he locked the door "because a drug deal was about to take place." When he was locking the door, the victim came at him aggressively, and that was when one of his co-defendants hit the victim in the head; the robbery ensued thereafter. Once the robbery was complete, the co-defendants placed the victim in the victim's car and drove away; he followed as a passenger in one of his co-defendant's

---

[1] In this appeal, the Petitioner abandons all other bases for relief save the basis alleged in the second amended post-conviction petition. Therefore, our review of all other grounds for relief has been waived. As such, we will limit our procedural account and analysis to the sole allegation pursued on appeal.

relatives' car. The Petitioner testified that trial counsel never told him that his especially aggravated robbery and especially aggravated kidnapping convictions could be merged and that he was never aware of that possibility. On cross-examination, he insisted that he never participated in removing the victim from the co-defendant's house, or placing the victim in the car, or the subsequent "dumping" of the victim out of the car and into someone's yard. The Petitioner also explained that he did not ride in the car during that kidnapping or participate in any other way. However, he did admit that he followed the co-defendants in a separate car; that, after they dumped the victim, he met the co-defendants at a gas station and got into the victim's car; and that he was subsequently apprehended by police after fleeing the victim's car.

Trial counsel testified that she had been practicing law since 1999, that she was a public defender from 1999 to 2009, and that she had tried many cases prior to the Petitioner's, noting that she tried nine cases in 2009 alone. Trial counsel further testified that she did not mention the merger argument to the Petitioner nor did she pursue it, explaining,

> Again, legally I couldn't make that argument because there were two actual confinements. Because of the confinement in the house, I believe his testimony in his statement mentioned that when the argument started[,] he slipped and locked the door at that time. And then there was a removal of the victim from the house so legally I could not make that argument. There were two separate incidents where he was actually kidnapped.

The post-conviction court found,

> [T]he [P]etitioner presented no testimony that established that trial counsel's efforts fell below the standard of competent counsel. The [P]etitioner offered nothing, except generalizations, concerning errors by trial counsel. No proof was offered that showed that critical witnesses were available and could have offered testimony that could have made a difference at trial. . . . [The] Petitioner has the burden to establish his claims for relief. . . . [He] has not met his burden of proof on this issue[,] and the claim is denied.

Specifically on the issue of merger, the post-conviction court found that, contrary to the Petitioner's assertions,

> the facts of the [P]etitioner's case do not fall within the type of case that was causing concern in [State v.]Anthony[, 817 S.W.2d 299 (Tenn. 1991)] or [State v. ]White[, 362 S.W.3d 599 (Tenn. 2012)]. The facts of the [P]etitioner's case show that the victim was beaten in his home then placed in a car and removed

from the premises. This is not a case where the false imprisonment was incidental to the Aggravated Robbery. In light of the facts of this case, failure to charge the jury in line with [the] White decision would have been harmless error beyond a reasonable doubt. This issue is without merit.

Post-conviction relief was denied, and this appeal followed.

# ANALYSIS

On appeal, the Petitioner contends that he received the ineffective assistance of counsel at trial. Specifically, the Petitioner alleges that trial counsel failed to request a jury instruction on merger of the offenses, requiring the jury to determine whether the kidnapping of the victim was beyond that necessary to complete the especially aggravated robbery. The State responds that the post-conviction court properly denied relief to the Petitioner because White did not create a new rule of law requiring retroactive application.[2]

Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See Nichols v. State, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded

---

[2] The State solely argues the inapplicability of White and does not address the issue under Anthony and its progeny as argued by the Petitioner in his brief. Although the Petitioner does mention analyzing this case under White, it is only advanced as an alternative if this court declines to apply the Anthony line of cases.

their testimony are questions to be resolved by the post-conviction court. <u>Bates v. State</u>, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

### *Ineffective Assistance of Counsel*

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. <u>State v. Honeycutt</u>, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the post-conviction court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. <u>Fields</u>, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The post-conviction court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. <u>Id.</u>

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>see</u> <u>Lockart v. Fretwell</u>, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the <u>Strickland</u> test. <u>See</u> <u>Henley</u>, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation was deficient, thus fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." <u>Strickland</u>, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Failure to satisfy either prong results in the denial of relief. <u>Id.</u> at 697, 700. The <u>Strickland</u> standard has also been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. <u>State v. Melson</u>, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. <u>Strickland</u>, 466 U.S. at 687; <u>Baxter v. Rose</u>, 523 S.W.2d 930, 936 (Tenn. 1975). In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn. 1982). "Thus, the fact that a particular strategy or tactic failed or even hurt the defense

does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The sole argument advanced on appeal in support of the Petitioner's ineffective assistance of counsel claim is that trial counsel failed to request a merger of the Petitioner's especially aggravated robbery and especially aggravated kidnapping convictions. Trial counsel testified that she could not advance this argument because there were two separate kidnapping incidents surrounding the robbery. Denying post-conviction relief, the post-conviction court found that the facts of the Petitioner's case reflected that it did not fall within the type of case causing the court concern in Anthony or White because the "false imprisonment was [not] incidental to the Aggravated Robbery." Although Anthony and its progeny were overruled by White and are no longer good law, we must analyze this issue under the former's dictates because the Petitioner's trial took place in 2009 and such was the prevailing law at the time.[3]

In Anthony, our supreme court first addressed the issue of whether movement incidental to an underlying crime such as robbery would be sufficient to sustain a separate kidnapping conviction. Anthony, 817 S.W.2d at 299. Expressing due process concerns, the court announced that the test of whether the kidnapping should be sustained was "whether the confinement, movement, or detention is essentially incidental to the accompanying felony . . . or whether it is significant enough, in and of itself, to warrant independent prosecution. . . ." Id. at 306. Later, in State v. Dixon, 957 S.W.2d 532, 535 (Tenn.1997), our supreme court modified Anthony:

In place of the Anthony "essentially incidental" analysis, we crafted an improved, two-part test in Dixon to determine whether a separate kidnapping conviction violates due process. First, we must determine if the movement or confinement of the victim was beyond that necessary to consummate the accompanying crime. This first prong of the Dixon test is a threshold determination. A showing that the movement or confinement was merely helpful to the commission of the accompanying crime will not establish a due process violation under the first prong of the Dixon test. Rather, the first prong of the Dixon test focuses on whether the movement or confinement was necessary to consummate the accompanying crime. If the movement or confinement was necessary to consummate the accompanying crime, then a separate kidnapping conviction violates due process, and no further analysis

---

[3] As stated by the post-conviction court and the State, White did not create a new rule of law requiring retroactive application. See White, 362 S.W.3d at 578. So, as White was decided in 2012, three years after the Petitioner's case was tried, its dictates are inapplicable here.

is required.

If, instead, the movement or confinement was beyond that necessary to consummate the accompanying crime, then the second prong must be addressed. The second prong considers "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm."

The Dixon two-part test fully replaces the Anthony "essentially incidental" analysis. As we previously have observed, the Dixon test "provides the structure necessary for applying the principles announced in Anthony." Although we adhere to the due process principles adopted in Anthony, we now make clear that the Anthony analysis should not be used in conjunction with the Dixon two-part test. The Dixon test should be used exclusively in all future inquiries.

State v. Richardson, 251 S.W.3d 438, 442-43 (Tenn. 2008) (internal citations omitted).

Applying the Dixon test to the instant case, we must first determine whether the victim's movement or confinement was beyond that necessary to consummate the especially aggravated robbery. Especially aggravated robbery is the intentional or knowing theft of property from a person, accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401, -403. We also note that, as relevant here, especially aggravated kidnapping is false imprisonment – knowingly removing or confining another unlawfully so as to interfere substantially with the other's liberty – accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon or where the victim suffers serious bodily injury. See id. at §§ 39-13-302, -305.

The Petitioner admitted at trial and at the post-conviction hearing that he locked the victim inside the house just before the robbery commenced. He also admitted that he held the victim down at some point during the robbery, and he did not deny participating in the victim's beating. Further, he agreed that he observed his co-defendants put the victim in the back of the victim's car; that he followed in a different car until the co-defendant's "dumped" the victim; that he met up with his co-defendants at a gas station, where he then got into the victim's car; and that he was subsequently apprehended by police while trying to flee from that car. The Petitioner continues to emphasize that he did not place the victim in the car after the robbery, that he was not in the car, and that he generally had no part in this subsequent "kidnapping." However, on direct appeal, this court concluded that the Petitioner

-12-

was just as responsible as his co-defendants for this later kidnapping under a theory of criminal responsibility, and we will not revisit that conclusion on appeal. See Fielder, 2011 WL 3689134, at *10. Thus, the Petitioner's not being a direct participant in this subsequent kidnapping is irrelevant to our analysis. As such, we conclude that the victim's movement was beyond that necessary to consummate the robbery because the robbery at the house was completed before the victim was ever removed from the house.

Moving to the second part of the analysis, we must determine whether "the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Given the extensive injuries the victim sustained during the robbery, as outlined above, we conclude that the victim's being thrown out of his car and left in someone's yard both lessened the Petitioner's risk of detection and created a significant danger and increased the victim's risk of harm. See e.g., Richardson, 251 S.W.3d at 444-45 (where our supreme court reached the same conclusion based on similar facts). Therefore, the especially aggravated kidnapping conviction for the victim's post-robbery confinement does not violate due process. Even if trial counsel would have requested that the trial court dismiss the especially aggravated kidnapping, arguing that it was incidental to the especially aggravated robbery offense on due process grounds, the trial court would not have granted such a request. As such, trial counsel's tactical decision not to request a dismissal of the especially aggravated kidnapping offense was neither deficient nor prejudicial to the Petitioner's case. The Petitioner is not entitled to relief on this issue.

CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-13-